### ST. LOUIS DRAYAGE CO. v. LOUISVILLE & N. R. R.

(Circuit Court, E. D. Missouri, E. D. December 17, 1894.)

#### No. 3,786.

INTERSTATE COMMERCE—CONNECTING CARRIERS—EXCLUSIVE PRIVILEGES.

Neither public policy nor any legislation forbids a railroad company engaged in interstate commerce to make an exclusive contract with a carrier, whose route connects with and extends beyond that of such railroad company, for through billing and rating over the connecting lines, and by which such carrier is given the exclusive right to receive from the railroad company and forward freight destined to points beyond the line of such railroad.

This was an action by the St. Louis Drayage Company against the Louisville & Nashville Railroad to recover damages for unjust discrimination. The case was heard by the court without a jury.

This is an action for damages for unjust discrimination and undue preferences in contravention of public policy. The case was submitted to the court without the intervention of a jury, with the understanding that the court would first determine the questions of law arising in the case, and, if

the court should be of opinion that the plaintiff was entitled to recover, it would either hear further evidence on the amount of damages, or refer the matter to a referee. There are several counts in the petition, but, as they involve practically the same questions of law, it will be sufficient to state the substantive allegations of the first count.

.The plaintiff is a corporation of the state of Illinois, engaged as a common carrier of freights in the city of St. Louis, Mo., and between said city, across the Mississippi river, and East St. Louis, ·in the state of Illinois. The defendant is a foreign railroad corporation, engaged in the business of. a common carrier, operating a line of railway from East St. Louis, Ill., to various points into states south of the Ohio river. The St. Louis Transfer Company is a Missouri corporation, engaged· in the business of a common carrier of freights over said Mississippi river, between the cities of St. Louis and East St. Louis, in the state of Illinois. The petition avers that, on east-bound freight delivered to defendant at East St. Louis by the St. Louis Transfer Company, the defendant pays to the transfer company its charges for hauling such freight from St. Louis to East St. Louis, and "absorbs" such charges in the tariff paid by the shipper, but, on freight.delivered to defendant by plaintiff under like circumstances, defendant refuses to pay plaintiff its drayage to East St. Louis, but adds the same to the regular tariff rate, which is paid by the shipper. So that on goods hauled from St. Louis to East St. Louis the expense to the shipper is the regular tariff from East St. Louis, plus plaintiff's drayage, whereas on goods hauled .to East St. Louis by the transfer company, the cost to the shipper is only the regular tariff rate from East St. Louis, and vice versa, as to freight from East St. Louis into the city of St. Louis. The answer admits that on freight hauled to East St. Louis by plaintiff for shipment to certain territory, known as "competitive points," the cost to the shipper is the regular tariff from East St. Louis, with plaintiff's drayage charges added, but denies that such freight is hauled by plaintiff and delivered to defendant under like conditions and similar circumstances to that which is hauled by the St. Louis Transfer Company. The answer further avers that the reason defendant pays to said St. Louis Transfer Company its drayage on this particular class of shipments, and absorbs the same out of its through rate from St. Louis, is because it has, by contract, employed said transfer company to haul such freight, and because it has a contract with the shipper to transport said freight from St. Louis, Mo., to point of destination. The answer sets out this contract of March 1, 1881, made six years before the plaintiff began to do business, between it and the transfer company, the material parts of which contract are as follows: (1) Said transfer company agreed, first, to furnish necessary wagons for prompt transportation of all freight, etc., between defendant's depot in East St. Louis and a depot to be furnished by said transfer company at its own cost, in St. Louis. (2) Said depot in St. Louis to be located satisfactory to defendant, and the expenses of all labor and clerical force at the depot in St. Louis to be borne by the transfer company; and the defendant was to furnish the necessary labor and clerical force to receive and deliver to said transfer company's wagons at East St. Louis. The transfer company agreed to collect and pay over to defendant all freights and charges that may be due on freight received by it from defendant; to give notice of arrival of freight to consignee, and be accountable for freight in its possession as warehousemen; that its clerks and employés should be satisfactory to defendant, etc. In consideration of the premises, defendant agreed to pay the transfer company certain rates for transfer of said freights on all freights transferred between the depot of the St. Louis Transfer Company in St. Louis and the defendant's depot in East St. Louis, while the transfer company was authorized to make additional charge for freight hauled from other points in St. Louis to defendant's depot in East St. Louis. Such additional charge to be collected from shipper. Said transfer company was to have the forwarding of freight from defendant's railway consigned to points through and beyond St. Louis, provided the same shall not have been contracted through to destination by defendant or its agents. Said transfer company is authorized to collect reasonable freight charges on freight remaining in its warehouse after 24 hours. Defendant agrees to employ said transfer company exclusively for such serv-

ices described in said agreement.     Said agreement to be terminated by either party on 90 days' notice in writing.     On October 23, 1893, said agreement was modified as to certain rates for transfer charges, but the transfer company continued as the exclusive wagon transfer connection of defendant between St. Louis and East St. Louis, except on certain perishable freight, where defendant was authorized to pay not exceeding two cents per 100 pounds for the transfer of the same; and it was further agreed that on business hauled by said transfer company from store doors or other points in the city of St. Louis, except the transfer company's depot, the defendant would only pay to said transfer company two cents per 100 pounds, and said transfer company was to collect any further charges from the shipper.     That the agreement, as modified, is now and has been in force since 1881.     That in making the agreement, and continuing it in force, the defendant had no desire or intention to discriminate against plaintiff, but, in good faith, to secure for itself and its patrons adequate facilities for the safe and prompt transfer of freight between its railway and the city of St. Louis.     Defendant is thus enabled to charge all persons, equal and alike, the actual rate as published in its tariff to and from St. Louis.     The evidence quite satisfactorily sustains the allegations of the answer.     It shows that the contract has been carried out between the defendant and the transfer company to the letter.     In all instances where it is alleged the defendant has discriminated against plaintiff in the matter of absorbing drayage rates, or loading and unloading freights at East St. Louis, the shipments were made from St. Louis proper on through tariff rate, and not from East St. Louis, as in the case of shipments hauled by plaintiff to East St. Louis, and vice versa.

Henry B. Davis, for plaintiff.
Orr, Christie & Bruce, for defendant.

PHILIPS, District Judge (after stating the facts).     The plaintiff's action proceeds upon the theory that the transfer company is an independent common carrier, and is engaged in interstate commerce between the cities of East St. Louis and St. Louis, and the defendant is engaged likewise as such common carrier between the states, with its western general terminus at East St. Louis.     This being so, the defendant railway company had the unquestioned right to enter into a contract with the transfer company for a continuous connecting business between East St. Louis and the city of St. Louis. No legislature and no court has ever yet undertaken to interfere with such right.     As said by the supreme court in Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U. S. 680, 4 Sup. Ct. 185:

"At common law, a carrier is not bound to carry, except on its own lines; and we think it quite clear that if he contracts to go beyond he may, in the absence of statutory regulations to the contrary, determine for himself what agencies he will employ.     His contract is equivalent to an extension of his line for the purpose of the contract; and if he holds himself out as a carrier beyond the line, so that he may be required to carry in that way for all alike, he may nevertheless confine himself in carrying to the particular route he chooses to use.     He puts himself in no worse position by extending his route with the help of others than he would occupy if the means of transportation employed were all his own.     He certainly may select his own agencies and his own associates for doing his own work."

See, also, Pullman's Palace Car Co. v. Missouri Pac. Ry. Co., 115 U. S. 598, 6 Sup. Ct. 194; also, Express Cases, 117 U. S. 1–26, 6 Sup. Ct. 542, 628; Little Rock & M. R. Co. v. St. Louis, I. M. & S. Ry. Co., 41 Fed. 559.

The proposition that it is not competent for a railroad company to make such a contract with another company without admitting

every other like concern into a corresponding arrangement, and conceding to them equal facilities and opportunities, has been expressly denied in the recent case of Little Rock & M. R. Co. v. St. Louis S. W. Ry. Co., 63 Fed. 775. In this case it is expressly held that the interstate commerce law does not require the common carrier to treat all other common carriers alike, without regard to its own interests; that the courts have no power to compel interstate carriers to enter into arrangements with each other for through rates; that for legislatures or courts to undertake to deprive railway carriers of the right to make their own contracts and arrangements with other companies for a continuous line would be an attempt to deprive such carriers—

"Of the management and control of their own property, by destroying their right to determine for themselves what contracts and tariff arrangements with connecting carriers are desirable, and what are undesirable."

And the conclusion reached by the court is that it—

"Is unable to adopt a construction of the interstate commerce act which will practically compel a carrier, when it enters into an arrangement with one carrier for through billing and rating, * * * to make the same arrangement with all other connecting carriers, if the physical connections for an interchange of traffics are the same, and to do this without reference to the question whether the enforced arrangement is or is not of any material advantage to the public."

So Mr. Justice Field, in Oregon Short-Line & U. N. Ry. Co. v. Northern Pac. R. Co., 51 Fed. 475, observed:

"It follows from this that the common carrier is left free to enter into arrangements for the use of its tracks or terminal facilities with one or more lines without subjecting itself to the charge of giving undue or unreasonable preferences or advantages to such lines, or of unlawfully discriminating against other carriers. In making arrangements for such use by other companies, a common carrier will be governed by considerations of what is best for its own interests."

The defendant company, by reason of its terminus on the east bank of the Mississippi river, was placed at a great disadvantage in competing with the St. Louis & Iron Mountain Railroad for traffic between the city of St. Louis and competing points south of the Ohio and east of the Mississippi rivers. It therefore became, as the evidence shows, a matter of supreme importance to the defendant company to effect such arrangement as to best enable it to bill freights immediately from the city of St. Louis through to such points at the same rates as the Iron Mountain Railroad. To this end it was essential that, in selecting a company for the transfer of its freights between St. Louis and East St. Louis, it should secure one fully equipped for doing the business,—solvent and reliable. It could not afford to take chances in so grave a matter. It might be unsafe to trust to the caprice of competing transfer companies, or to sporadic rivalries. It could not foresee how long it would be before the railroad company, in such dependence, might find itself a prey to a "combine" among the transfer companies, or become exposed to the not improbable contingency of a rivalry between competing companies, which would break both down, leaving the railroad company without a certain, reliable connection with the city.

It would be harsh, unreasonable, and questionable legislation that would deny to the common carrier the protection of a provident, reliable contract, like the one in question. It was essential to a reliable and permanent arrangement that the transfer company should establish and maintain sufficient warehouse buildings for the reception and storage of freights collected from the city of St. Louis, and that the company with which it contracted should have ample facilities and equipments to successfully carry out such connecting arrangement. All this, the evidence shows, was represented in the business character, standing, and capital of the transfer company, which, without disparaging the business character of the younger company, it is not too much to say, the defendant would not find in the plaintiff company to the extent presented in the transfer company. So long as the public enjoys the advantages of the competition between the defendant company and other railroad companies, in securing through rates for freights to competitive points, it is of no concern to the public that the plaintiff drayage company cannot share equally in the business of the defendant company. Especially so when the plaintiff makes no showing of any benefit to the shipper by admitting it to equal facilities with the transfer company. It certainly was not in the mind of congress, in enacting the interstate commerce law, to interfere with such contract as this defendant company entered into in 1881. And, as the defendant has kept and performed its contract to the letter, the court ought not to interfere, when such contract neither contravenes any statute law, nor is contrary to sound public policy. The result cannot be different whether the contract between the transfer company and the defendant be regarded as a connecting line between two independent carriers engaged in interstate commerce, or whether it be regarded as a selection by the railroad company of the transfer company as an agency for the delivery of the defendant's freight between East St. Louis and the city of St. Louis. The law is that the plaintiff cannot recover. Judgment accordingly.