SANDUSKY-PORTLAND CEMENT CO. v. BALTIMORE & O. R. CO.

(Circuit Court of Appeals, Seventh Circuit. April 11, 1911.)

No. 1,719.

1. CARRIERS (§ 189*)—REASONABLE RATES—PUBLIC POLICY.

Common carriers being required to furnish service at reasonable rates, it is as much a matter of public policy that established rates be not unreasonably low as that they be not unreasonably high.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 162, 854–865; Dec. Dig. § 189.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. COMMERCE (§ 89*)—INTERSTATE COMMERCE COMMISSION—COURTS—JURISDIC-
    TION.

    Where a railroad company entered into a contract with complainant
that, in consideration of complainant's establishment of a cement factory
on its line with a capacity of not less than 600 barrels a day, the carrier's
regular established tariff rates on cement during a specified period should
not exceed those set out in a schedule, complainant, in a suit to restrain
the railroad company from establishing and filing higher rates than those
contained in the schedule, could not obtain such relief in the courts in
advance of a finding by the Interstate Commerce Commission on the issue
whether the subsequent rates were reasonable or unreasonable, to be de-
termined in the light of the railroad's operation as an entirety.

    [Ed. Note.—For other cases, see Commerce, Dec. Dig. § 89.*]

Appeal from the Circuit Court of the United States for the District
of Indiana.

Bill by the Sandusky-Portland Cement Company against the Balti-
more & Ohio Railroad Company. From a decree dismissing the bill,
complainant appeals. Affirmed.

The appeal is from a decree of the Circuit Court dismissing the
bill for want of equity; a demurrer to the bill having been sustained
by the court, and the appellant having failed and refused to further
amend. The facts are stated in the opinion.

Allen C. Dustin, James H. Hoyt, Hermon A. Kelley, Homer H. Mc-
Keehan, and Horace Andrews, for appellant.

F. A. Durban, W. H. Miller, C. C. Shirley, and S. D. Miller, for
appellee.

Before GROSSCUP, BAKER, and KOHLSAAT, Circuit Judges.

GROSSCUP, Circuit Judge, delivered the opinion.

Appellant is a corporation under the laws of the State of Indiana,
and appellee a corporation under the laws of the State of Maryland.
The prayer of the bill was for a mandatory injunction, commanding
and enjoining appellee to establish, publish and maintain the tariff
rates specified in a contract between appellee and appellant, dated
January 1, 1900, running, by its terms, for the period of twenty years,
and that appellee be enjoined from putting into effect tariff rates sub-
sequently established and published by it—such rates being filed, estab-
lished and published in accordance with the Interstate Commerce Act.
[Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p.
3154).]

In its contract of January 1, 1900, appellee agreed that, in consider-
ation of the erection of a plant by appellant at Syracuse, Indiana, for
the manufacture of Portland cement, of a capacity of not less than six
hundred barrels per day, "its regular established tariff rates of trans-
portation upon the freight hereinafter mentioned, shall, during the
period of this agreement, in no case exceed the rates set out in the
following schedule." Then followed a schedule. The rates now es-
tablished and filed with the Interstate Commerce Commission by ap-
pellee (the rates sought to be enjoined) do exceed this schedule.

The theory of appellant is that, having given a quid pro quo for appellee's obligation (established a plant at great expense upon its line of railroad, whereby appellee has received rates in excess of $1,-300,000, that, but for the plant thus established, it would not have received) appellee's obligation to maintain the schedule agreed upon is valid at common law (citing 1 Wood on Railroads, § 179; Himrod Furnace Co. v. Railway Co., 22 Ohio St. 451 and 37 Ohio St. 321; Beach on Priv. Corp., vol. 2, § 407; C. & A. R. R. Co. v. Coal Co., 79 Ill. 121, and other cases in the State courts); and that such agreement is not discriminatory within the meaning of the Interstate Commerce Act, because the agreed rate is a rate open alike to all at Syracuse, Indiana. For this latter reason, it is said, the rate is not within the ruling of Texas & Pacific R. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, and Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681.

[1] Railroads are common carriers, required to furnish service at reasonable rates; and it is of just as much consequence to the public that the rates established be not unreasonably low as that they be not unreasonably high; for non-compensatory rates result either in depreciation of service, or higher rates upon other particular commodities—neither railroads nor any other enterprise, in the nature of things, being willing to operate at a loss. Recognizing this, appellant concedes that if it be shown that the contract rate would result in loss to the carrier it cannot be enforced; but insists that a showing such as this is a defense, the burden of which is upon the carrier; and that the power to determine the fact involved in such defense is in any tribunal that has jurisdiction over the parties to enforce their contracts.

[2] We do not concur in this view. The agency of the government, established for the purpose of seeing that rates are not unreasonable, is the Interstate Commerce Commission. The filing of appellee's subsequent rates, against which the injunction in this case is invoked, opened to the jurisdiction of the Interstate Commerce Commission the inquiry as to whether such subsequent rates were reasonable or unreasonable, to be determined in the light of the railroad company's operation as an entirety. To open this jurisdiction to other tribunals, except to the extent that the judicial tribunals may review the Interstate Commerce Commission, would, to use the language of the present Chief Justice in the Abilene Case, supra, "be the absolute destruction of the act (the Interstate Commerce Act) and the remedial provisions which it created * * *. For if, without previous action by the Commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that unless all courts reached an identical conclusion a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question. Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the Commission, and with the

duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed."

True, in the Abilene Case, the question, taken away from the jurisdiction of all tribunals other than the Interstate Commerce Commission, is the question of the inherent reasonableness of the rate—the common law obligation of the Company being to carry for a reasonable rate—while the question put to us here by the appellant, as one that a court may decide independently of the Commission, is whether the contract rate would result in loss to the carrier—the carrier being under alleged contract obligations to carry at such rates.  True, too, that before the Abilene Case it was held by some State courts that such a contract was valid and could be enforced.  The beginning of this line of decisions, however, was before the enactment of the Interstate Commerce Act.  They express the view prevailing in the absence of such a national regulation law.  But for the Abilene Case, this view might continue.  Indeed, that case went from the Texas Civil Court of Appeals, where, considered in connection with the Interstate Commerce Act, it was decided contrary to the view subsequently taken by the Supreme Court of the United States.  The decision in the Supreme Court, however, settles the law on the subject. Under the law as thus settled, the Interstate Commerce Commission, charged with a unitary administration of interstate regulations, supersedes the primary jurisdiction of all other tribunals upon the questions of fact arising upon interstate rates.  And this is true, even in the absence of express language to that effect; for the Abilene decision was laid down upon propositions of law flowing wholly from such interpretation as is to be "accomplished by implication."

Now, if a unitary administration of. interstate regulations was one of the purposes of the Interstate Commerce Act, superseding, in matters of what the rate should be, the jurisdiction of all other tribunals, except such as is founded upon the Interstate Commerce Commission's primary jurisdiction over rates, such purpose extends to the case before us as well as to the case presented to the Supreme Court in the Abilene Case; for to enforce contracts by the carriers, binding them to file and maintain given rates for the future, subject only to the determination of the Court, where the contract arises, that the rates thus contracted would not result in loss to the railroad company, just as effectually embarrasses and destroys the remedial provisions of the Interstate Commerce Act as would the exercise of the old common law jurisdiction, by the State courts, of enforcing rates that each of said courts determined to be reasonable.  One as much as the other, or if not as much as the other, in some degree in line with the other, introduces into the system, intended to be effective by being unitary, a diversity, that to a large measure would destroy the effectiveness of interstate regulation altogether.  And such, following the reasoning of the Supreme Court in the Abilene Case, could not have been within the purpose of Congress in the enactment of the Interstate Commerce Act.

The judgment of the Circuit Court is affirmed.