UNITED STATES v. PACIFIC & A. RY. & NAV. CO. et al.

(Third Division. Juneau. April 29, 1912.)

No. 837B.

1. COMMERCE (§ 89*)—COURTS—JURISDICTION—CONSPIRACY—INDICTMENT—CARRIERS.

The indictment charges that defendant corporations owned lines of transportation by water and rail extending from Seattle, Wash., and Vancouver, B. C., via Skagway, Alaska, to White Horse in Yukon territory, and thence down the Yukon river to points in Yukon territory and Alaska; that by combination and agreement they monopolized the business of interstate and interforeign transportation of passengers and property over the route and excluded the Humboldt Steamship Company and other common carriers and shippers from equal rates and facilities over the route and over the Skagway wharf, denied shippers and carriers through routing, and discriminated against carriers and shippers in the matter of equal rates; upon demurrer, *held*, that the court is without jurisdiction to determine the questions involved in the indictment, in either a criminal or civil proceeding, until such matters have been submitted to and passed upon by the Interstate Commerce Commission.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 89.*]

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

2. CARRIERS (§ 32\*)—COMMERCE (§ 89\*)—INTERSTATE—COURTS—JU-
RISDICTION.

The facts charged in each of the first five counts in the indict-
ment are substantially that the defendants discriminated against
other common carriers by inducing the defendant railroad com-
pany to enter into through routing arrangements with other car-
riers than the defendant steamship companies, and by inducing
the defendant railroad company to charge higher rates for freight
carried to Skagway on the steamer Humboldt or by any other
carrier not owned by one of the defendant steamship companies,
and by charging such independents higher wharfage rates. *Held*,
first, that no action will lie for the recovery of excessive freight
charges, providing such charges are in conformity with the sched-
ule of rates filed with the Interstate Commerce Commission, un-
til the matter has first been submitted to the Commission and a
ruling from that body obtained; second, that no mandamus pro-
ceeding can be instituted on account of alleged discriminations
or preferences until the same has been submitted to the Commis-
sion and the Commission has ruled upon the same, unless it be in
some instances where the discrimination is so plain and the duty
of the carrier so apparent as not to require the exertion of the
discretion conferred on the Commission by the act to determine
whether or not the law has been violated; third, that no action
will lie for the recovery of alleged excessive rates resulting from
discrimination, providing the rates charged are in accordance
with the schedules, although apparently discriminatory.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85;
Dec. Dig. § 32;\* Commerce, Dec. Dig. § 89.\*]

3. MONOPOLIES (§ 31\*)—CONSPIRACY IN RESTRAINT OF TRADE—COM-
MERCE—INTERSTATE.

The sixth count of the indictment charges that defendants
conspired to force the Humboldt Steamship Company to enter
into an agreement with defendants to maintain rates and sup-
press competition among carriers named, under section 3 of the
Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209
[U. S. Comp. St. 1901, p. 3201]). Upon demurrer, *held*, the
objection is technical, and, in any event, the count charges suffi-
cient facts to show a violation of section 3 of the act, and the
indictment charging a violation of section 5440, Rev. St. (U. S.
Comp. St. 1901, p. 3676), may be treated as surplusage. Demur-
rer overruled.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20;
Dec. Dig. § 31.\*]

4. INDICTMENT AND INFORMATION (§ 82\*)—CODEFENDANTS.

An indictment against corporation defendants also made cer-
tain individuals defendants, but failed to charge that the in-
dividual defendants were either officers or agents of the defend-

\*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

ant corporations, and failed to charge the individual defendants with specific facts, but only that they aided and abetted the corporations without stating how. On demurrer, *held*, indictment fatally defective as to the individuals, and demurrer as to the individuals sustained.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 225; Dec. Dig. § 82.*]

The indictment in this case contains six counts. Counts 1 and 2 charge violations of sections 2 and 3 of an act entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act (26 Stat. 209); counts 3 and 4 charge violations of section 1 of an act entitled "An act to further regulate commerce with foreign nations and among the states" (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1911; p. 1309]), as amended by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1288); count 5 charges violations of section 1 of the Interstate Commerce Act as amended (Act June 18, 1910, c. 309, 36 Stat. 545 [U. S. Comp. St. Supp. 1911, p. 1288]); count 6 charges a violation of section 5440 of Rev. St. 1878 (U. S. Comp. St. 1901, p. 3676).

To each count the defendants interposed a motion to quash substantially the same as in cause No. 836B (United States of America v. North Pacific Wharves & Trading Co., a corporation, et al.).

John Rustgard, Dist. Atty., of Juneau, for the United States.

Bogle, Graves, Merritt & Bogle, of Seattle, Wash., Winn & Burton, of Juneau, Farrell, Kane & Stratton, of Seattle, Wash., Shackleford & Bayless, of Juneau, Ira Bronson, of Seattle, Wash., and Royal A. Gunnison, of Juneau, for defendants.

LYONS, District Judge. In this as in all of the other cases now pending in this court, wherein the indictments charge violation of the Sherman Act and the Interstate Commerce Act and its amendments, counsel argued the merits of the questions presented without regard to the technical consideration as to whether they should be raised by motion to quash or by de-

murrer. For the reasons stated in the opinion in cause No. 836B (United States of America v. North Pacific Wharves & Trading Co., a corporation, et al., 4 Alaska, 552), the court will discuss the objections to the indictment as if the questions were presented by demurrer and not by motion to quash, as the court considers a demurrer the proper remedy to raise the questions involved.

Counts 1 and 2 charge violations of sections 2 and 3 of an act entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act (26 Stat. 209). Counts 3 and 4 charge violations of section 1 of an act entitled "An act to further regulate commerce with foreign nations and among the states" (32 Stat. 847), as amended by the act of June 29, 1906 (34 Stat. 584). Count 5 charges violations of section 1 of the Interstate Commerce Act, as amended (36 Stat. 545). Count 6 charges a violation of section 5440 of the Revised Statutes of the United States. Substantially the same facts, however, are charged in counts 1, 2, 3, 4, and 5, excepting that in count 5 there is no allegation of discrimination in wharfage charges; but for the purpose of this opinion, and in the view taken by the court of the questions involved, the first five counts of the indictment will be discussed together, as the reasoning in the determination of the sufficiency of count 1 to state a crime will apply to all of the other counts in the indictment, except count 6. The objections to the indictment on account of the joinder of counts has already been passed upon by the court in cause No. 836B (United States of America v. North Pacific Wharves & Trading Co., a corporation, et al.), adversely to the contention of the defendants. Counts 1 and 2 also charge the defendants with a violation of sections 2 and 3 of the Sherman Act; but the facts therein alleged are substantially the same as are alleged in counts 3 and 4, which charge the defendants with discriminating against the Humboldt Steamship Company, and count 5, which charges the defendants with a refusal to grant through routing privileges to the Humboldt Steamship Company. It becomes necessary, therefore, for the court to determine whether or not the court has jurisdiction in the first

instance to pass upon the questions involved, either in a civil or a criminal action, or whether or not such questions must be first determined by the Interstate Commerce Commission.

The facts charged in each of the first five counts are substantially that the defendants discriminated against other common carriers by inducing the defendant railroad company to enter into through routing arrangements with other carriers than the defendant steamship companies, and by inducing the railroad company to charge higher rates for freight carried to Skagway on the Humboldt or by any other carrier not owned by one of the defendant steamship companies, and further that freight carried on vessels of either companies was charged a higher wharfage rate by the defendant wharf company. There are three cases recently decided by the Supreme Court of the United States which shed a flood of light upon the questions involved on account of the comprehensive discussion of the jurisdiction of the Interstate Commerce Commission in the opinions by the court in these three cases.

In re Texas & Pacific Railroad Co. v. Abilene Cotton Oil Co., 204 U. S. 427, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075, which was an action against the railroad company to recover $1,951.83, the same being claimed to be the excess over a reasonable rate, which the railroad company had charged for transporting freight for the plaintiff, the rate charged by the railroad company being in accordance with its schedule of rates filed with the Interstate Commerce Commission, the court in passing on the question, among other things, said:

"The Commission was endowed with plenary administrative power to supervise the conduct of carriers, to investigate their affairs, their accounts, and their methods of dealing, and generally to enforce the provisions of the act. To that end it was made the duty of the district attorneys of the United States, under the direction of the Attorney General, to prosecute proceedings commenced by the Commission to enforce compliance with the act. The act specifically provided that whenever any common carrier, subject to its provisions, 'shall do, cause to be done, or permit to be done any act, matter, or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this act required to be done, such carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such vio-

lation of the provisions of this act. * * *' Power was conferred upon the Commission to hear complaints concerning violations of the act, to investigate the same, and, if the complaints were well founded, to direct not only the making of reparation to the injured persons, but to order the carrier to desist from such violation in the future. In the event of the failure of a carrier to obey the order of the Commission, that body, or the party in whose favor an award of reparation was made, was empowered to compel compliance by invoking the authority of the courts of the United States in the manner pointed out in the statute; prima facie effect in such courts being given to the findings of fact made by the Commission."

The court further said on pages 439 to 441 of 204 U. S., on page 355 of 27 Sup. Ct. (51 L. Ed. 553, 9 Ann. Cas. 1075):

"When the general scope of the act is enlightened by the considerations just stated, it becomes manifest that there is not only a relation, but an indissoluble unity, between the provision for the establishment and maintenance of rates until corrected in accordance with the statute and the prohibitions against preferences and discrimination. This follows, because, unless the requirement of the uniform standard of rates be complied with, it would result that violations of the statute as to preferences and discrimination would inevitably follow. This is clearly so, for if it be that the standard rates fixed in the mode provided by the statute could be treated on the complaint of the shipper by a court and jury as unreasonable without reference to prior action by the Commission, finding the established rate to be unreasonable and ordering the carrier to desist in the future in violating the act, it would come to pass that a shipper might obtain relief upon the basis that the established rate was unreasonable, in the opinion of a court and jury, and thus such shipper would receive a preference or discrimination not enjoyed by those against whom the schedule of rates was continued to be enforced. This can only be met by the suggestion that the judgment of a court, when based upon a complaint made by a shipper without previous action by the Commission, would give rise to a change of the scheduled rate, and thus cause the new rate resulting from the action of the court to be applicable in the future as to all. This suggestion, however, is manifestly without merit, and only serves to illustrate the absolute destruction of the act and the remedial provisions which it created which would arise from a recognition of the right asserted. For if, without previous action by the Commission, power may be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that, unless all courts reached an identical conclusion, a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to the reasonableness by the various courts called upon to consider the subject as an original question. Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the Commission and with the duty which the statute casts upon that

body of seeing to it that the statutory requirement as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the Commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction and a different one in another, would destroy the prohibitions against preferences and discrimination, and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted."

The court further said on page 448 of 204 U. S., on page 358 of 27 Sup. Ct. (51 L. Ed. 553, 9 Ann. Cas. 1075):

"Concluding, as we do, that a shipper seeking reparation predicated upon the unreasonableness of the established rate must, under the act to regulate commerce, primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule, because the rates fixed therein are unreasonable, it is unnecessary further to consider whether the court below would have had jurisdiction to afford relief if the right asserted had not been repugnant to the provisions of the act to regulate commerce."

In re Baltimore & Ohio Ry. Co. v. Pitcairn Coal Co., 215 U. S. 492, 493, 30 Sup. Ct. 164, 169 (54 L. Ed. 292), which was a proceeding by mandamus on the part of the coal company to compel the railroad company to refrain from discriminating in the distribution of cars among the mine owners, the court used the following language:

"When the situation is thus defined, we see no escape from the conclusion that the grievances complained of were primarily within the administrative competency of the Interstate Commerce Commission and not subject to be judicially enforced, at least until that body, clothed by the statute with authority on the subject, had been afforded, by a complaint made to it, the opportunity to exert its administrative functions. The controversy is controlled by the considerations which govern the ruling made in Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426 [27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075]. In that case suit was brought in a court of the state of Texas to recover, because of the exaction by a carrier, on an interstate shipment, of an alleged unreasonable rate, although the rate charged was that stated in the schedules duly filed and published in accordance with the act to regulate commerce. After great consideration, it was held that the relief prayed was inconsistent with the act to regulate commerce, since by that act the rates, as filed, were controlling until they had been declared to be unreasonable by the Interstate Commerce Commission on a complaint made to that body. It was pointed out that any other view would give rise to inextricable confusion, would create unjust preferences and undue

discriminations, would frustrate the purposes of the act, and, in effect, cause the act to destroy itself. The ruling there made dealt with the provisions of the act as they existed prior to the amendments adopted in 1906, and, when those amendments are considered, they render, if possible, more imperative the construction given to the act by that ruling, since by section 15, as enacted by the amendment of June 29, 1906, the Commission is empowered, indeed it is made its duty, in disposing of a complaint, not only to determine the legality of the practice alleged to give rise to the unjust preference or undue discrimination, and to forbid the same, but, moreover, to direct the practice to be followed as to such subject for a future period, not exceeding two years, with power in the Commission, if it finds reason to do so, to suspend, modify, or set aside the same; the order, however, to become operative without judicial action. In considering section 15 in the case of Interstate Commerce Commission v. Illinois Central Ry. Co., which was decided 215 U. S. 452 [30 Sup. Ct. 155, 54 L. Ed. 280], it was pointed out that the effect of the section was to cause it to come to pass that courts, in determining whether an order of the Commission should be suspended or enjoined, were without power to invade the administrative functions vested in the Commission, and therefore could not set aside an order duly made on a mere exercise of judgment as to its wisdom or expediency. Under these circumstances, it is apparent, as we have said, that these amendments add to the cogency of the reasoning which lead to the conclusion in the Abilene Case that the primary interference of the courts with the administrative functions of the Commission was wholly incompatible with the act to regulate commerce. This result is easily illustrated. A particular regulation of a carrier engaged in interstate commerce is assailed in the courts as unjustly preferential and discriminatory. Upon the facts found, the complaint is declared to be well founded. The administrative powers of the Commission are invoked concerning a regulation of like character upon a similar complaint. The Commission finds, from the evidence before it, that the regulation is not unjustly discriminatory. Which would prevail? If both, then discrimination and preference would result from the very prevalence of the two methods of procedure. If, on the contrary, the Commission was bound to follow the previous action of the courts, then it is apparent that its power to perform its administrative functions would be curtailed, if not destroyed. On the other hand, if the action of the Commission was to prevail, then the function exercised by the court would not have been judicial in character, since its final conclusion would be susceptible of being set aside by the action of a mere administrative body."

The court further said on page 499 of 215 U. S., on page 171 of 30 Sup. Ct. (54 L. Ed. 292):

"This conclusion being in reason impossible, it must follow that, construing the provisions of section 23 in the light of and in harmony with the amendments adopted in 1906, the remedy afforded by

that section, in the cases which it embraces, must be limited either to the performance of duties which are so plain and so independent of previous administrative action of the Commission as not to require prerequisite exertion of power by that body, or to compelling the performance of duties which plainly arise from the obligatory force which the statute attaches to orders of the Commission, rendered within the lawful scope of its authority, until such orders are set aside by the Commission or enjoined by the courts."

In re Robinson v. Baltimore & Ohio R. R. Co., decided by the Supreme Court of the United States on January 9, 1912, and reported in 222 U. S. 506, 32 Sup. Ct. 114, 56 L. Ed. 288, which was an action by a shipper to recover damage resulting from excessive freight charges for transporting coal, the schedule of rates provided that the railroad company charge 50 cents per ton more for hauling coal when the same was loaded from wagons than it charged when the loading was from a tipple, and the plaintiff claimed that the same was unjust and discriminatory. The court said, among other things:

"It was contended by him in the Supreme Court of Appeals of the state, and is contended now, that the question should be answered in the affirmative because of the provision in section 22 that: 'Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies.' But it must be ruled otherwise, and for these reasons: The act, * * * whilst prohibiting unreasonable charges, unjust discriminations, and undue preferences subject to its provisions, also prescribed the manner in which that prohibition should be enforced; that is to say, the act laid upon every such carrier the duty of publishing and filing, in a prescribed mode, schedules of rates to be charged for the transportation of property over its road, declared that the rates named in schedules so established should be conclusively deemed to be the legal rates until changed as provided in the act, forbade any deviation from them while they remained in effect, invested the Interstate Commerce Commission with authority to receive complaints against rates so established and to inquire and find whether they were in any wise violative of the prohibitions of the act, and, if so, what, if any, injury had been done thereby to the person complaining or to others, and further authorized the Commission to direct the carrier to desist from any violation found to exist, and to make reparation for any injury found to have been done. Provision was also made for the enforcement of the order for reparation by an action in the Circuit Court of the United States, if the carrier failed to comply with it. Thus, for the purpose of preventing unreasonable charges, unjust discriminations, and undue preferences, a system of establishing, maintaining, and altering rate schedules and of redressing injuries resulting

from their enforcement was adopted, whereby publicity would be given to the rates, their application would be obligatory and uniform while they remained in effect, and the matter of their conformity to prescribed standards would be committed primarily to a single tribunal clothed with authority to investigate complaints and to order the correction of any nonconformity to those standards by an appropriate change in schedules and by due reparation to the injured persons."

The court further said:

"It is true, as was urged in argument, that in that case (referring to the Abilene Case) the complaint against the established rate was that it was unreasonable, while here the complaint is that the rate was unjustly discriminatory. But the distinction is not material. The power of the Commission over the two complaints is the same; one is as likely to become the subject of diverging opinions and conflicting decisions as is the other; and if a court, acting originally upon either, were to sustain it and award reparation, the confusing anomaly would be presented of a rate being adjudged to be violative of the prescribed standards, and yet continuing to be the legal rate, obligatory upon both carrier and shipper."

The three cases cited establish the following propositions: First. That no action will lie for the recovery of excessive freight charges, providing such charges are in conformity with the schedule of rates filed with the Interstate Commerce Commission, until the matter has first been submitted to the Commission and a ruling from that body obtained. Second. That no mandamus proceedings can be instituted on account of alleged discriminations or preferences until the same has been submitted to the Commission and the Commission has ruled upon the same, unless it be in some instances where the discrimination is so plain and the duty of the carrier so apparent as not to require the exertion of the discretion conferred on the Commission by the act to determine whether or not the law has been violated. Third. That no action will lie for the recovery of alleged excessive rates resulting from discrimination, providing the rates charged are in accordance with the schedules, although apparently discriminatory.

It is true the three cases cited are civil cases, but the reasons assigned for the conclusions of the court are equally applicable to criminal cases. Can it be successfully contended that, if the defendants in any of these cases had been indicted

on account of the alleged unreasonable charges or discrimination, the court would have sustained such indictment? So far as an unreasonable rate is concerned, there would have been no standard to guide the jury in determining what is a reasonable rate, for the law says that the scheduled rates are the legal rates binding upon the carrier, and only subject to change at the instance of a shipper by the Interstate Commerce Commission or by the Interstate Commerce Commission on its own initiative. Therefore, until the legally constituted authority has determined that the rates are unreasonable, they must be held to be the legal rates. And, with reference to the discriminations charged in these cases, it might be that a court or a jury might hold the discrimination undue and unwarranted, while the Commission might, after a full consideration of the questions involved, determine that the discriminations were only apparent and were justified by the difference in the conditions, and if the court were to sustain an indictment under such circumstances, and the jury should find that the practices or charges were unreasonably discriminatory, and the same matter should thereafter be submitted to the Commission, which might determine that the apparent discriminatory practices were warranted on account of the difference in the circumstances, under which the discrimination was granted, would not the defendant or defendants have been illegally convicted? The object of the Interstate Commerce Act is to procure equality among shippers, and the best method provided for securing equality is by insuring uniformity, and uniformity can only be guaranteed by lodging with one forum the power and authority to determine what are reasonable and unreasonable rates and what are undue and unjust discriminatory practices. See Van Patten v. Chicago, M. & St. P. Ry. Co. (C. C.) 81 Fed. 545. On page 553 the court, among other things, said:

"Furthermore, if it be true that the establishment of reasonable rates for railway services is to be left to the verdict of juries, rendered long after the services have been performed, it is apparent that it will be wholly impossible to secure equality or uniformity therein, and of necessity preferences would result therefrom in favor of individuals and localities, thus violating the most important principle of the act in question."

"Where two connecting lines agree on a joint through tariff, such joint tariff, or the share of which either takes, is not the standard by which to determine whether either line violates, by its local rates, section 3 of the Interstate Commerce Act, forbidding undue preferences. The 'undue preferences' clause of the Interstate Commerce Act is indefinite and uncertain, and a conviction for its violation cannot be sustained, where the criminality of the act is made to depend on whether the jury think a preference reasonable or unreasonable." Tozer v. United States (C. C.) 52 Fed. 917; Chicago & N. W. Ry. Co. v. Osborne, 52 Fed. 912, 3 C. C. A. 347.

It is true in this case the Interstate Commerce Commission has refused to include within its jurisdiction the territory of Alaska, but no complaint can be lodged against these defendants for not having filed their schedules of rates with the Interstate Commerce Commission, if the latter refuses to receive them; in fact, the indictment does not charge a refusal on the part of any of the defendants to subject to the Interstate Commerce Act to file their schedules in accordance with the act. Nor do any of the counts in the indictment charge that the defendants, or any of them, charged one shipper any greater rate than any other shipper.

Five of the counts in the indictment do charge that the wharf company charged a greater wharfage for freight shipped by boats not owned by the three defendant steamship companies, but, as was held in the two cases last cited, the rates charged by connecting carriers on freight which has been through routed over such carriers may be less than the sum of the locals, and yet not be unduly discriminatory, and it may be that the wharf company charged greater wharfage to companies who had not made through routing arrangements or could not make through routing arrangements with the railroad company, and the wharf company may be legally justified in making such discrimination in its charges. Whether the difference in the rates charged between the freight shipped under through routing arrangements and that shipped under any other arrangement is unduly discriminatory certainly must be a question to be determined and passed upon by the Interstate Commerce Commission, providing the wharf company can be considered an instrumentality of the railroad and subject to the Interstate Commerce Act; and it is the judgment of the court,

according to the facts charged in the indictment, that the
wharf is such instrumentality and subject to the act, as held
by the United States Supreme Court in Re Southern Pacific
Terminal Co. v. Interstate Commerce Commission, 219 U. S.
498, 31 Sup. Ct. 279, 55 L. Ed. 310.

It is also charged in the indictment that $2 per ton is an un-
reasonable wharfage rate; but shall a jury determine that
fact in the trial of a criminal action? There are a great many
facts to consider in determining what would be and what is
an unreasonable wharfage charge, and, as before stated, the
jury in their finding might differ very materially from the
Interstate Commerce Commission, after the latter had oppor-
tunity to consider and pass upon the question. It seems ob-
vious that the question of unreasonable wharfage rates and
the question of discriminatory wharfage rates must be deter-
mined by the Commission before the court acquires jurisdic-
tion, either in criminal or civil proceedings, to entertain con-
troversies involving the consideration of such questions, ex-
cept in cases where the discrimination is practiced under sub-
stantially the same conditions and circumstances, wherein
there would be no justification or reason for two juries differ-
ing in opinion as to the legality of the discrimination charged,
such as instances where the jury would be required to pass
upon the question as to whether the carrier had charged a
shipper more than its published rates. If it be true that great-
er wharfage rates were charged one shipper than were charg-
ed another shipper under identical conditions, the question
involved would be materially different, for then the jury would
have a standard to guide them, to wit, the minimum rates
charged for such a service, as was held in the case of Armour
Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428,
52 L. Ed. 681; but the various counts in this case show that
the difference in the wharfage rates were charged under dif-
ferent conditions, one under through rating arrangements be-
tween the steamship carrier and the railroad, and the other
in the absence of such through rating arrangements. Counsel
for the government contends that, under and by virtue of the

following clause found in section 1 of the Interstate Commerce Act, as amended (36 Stat. 545) :

"And to establish through routes and just and reasonable rates applicable thereto."

The railroad company is obliged to grant through routing privileges to all petitioning connecting carriers. But, even if that portion of the section were held to be mandatory, there is no reason for assuming that the carrier, which is the railroad company in this instance, would be compelled to grant through routing privileges to every petitioning carrier. It does not follow that it would be compelled to grant through routing privileges with every company proposing to through route with the railroad company. The object of that provision of the statute is to accommodate shippers, and it cannot be said that it was ever enacted for the purpose of enabling every carrier to force every other connecting carrier to through route with it, no matter what the circumstances might be.

In Re Cardiff Coal Co. v. Chicago, M. & St. P. Ry. Co. et al., 13 Interst. Com. R. 461, the Commission said, on page 465 :

"Under the common law, as has often been said, the establishment by connecting carriers of through routes and joint rates was fundamentally a matter of contract. Railroads cannot be compelled to carry traffic beyond their own rails; they cannot be compelled to deliver shipments at points on the lines of connecting roads. But the act to regulate commerce as amended, effects a change in the law in that respect. While the greater part of the traffic of the country is carried on through routes voluntarily established by the connecting lines, the law nevertheless confers upon the Commission authority to require carriers to establish such through routes when they have failed or refused voluntarily to do so, and when there is no reasonable or satisfactory through route already in existence. The provision in question is found in section 15 of the act, and is as follows: The Commission may also, after hearing on a complaint, establish through routes and joint rates as the maximum to be charged and prescribe the division of such rates as hereinbefore provided, and the terms and conditions under which such through routes shall be operated, when that may be necessary to give effect to any provision of this act, and the carriers complained of have refused or neglected to voluntarily establish such through routes and joint rates, provided no reasonable or satisfactory through route exists, and this provision shall apply when one of the connecting carriers is a water line. In connection with that provision the language of section 1

must not be overlooked. Carriers are there required 'to establish through routes and just and reasonable rates applicable thereto.' The meaning of this latter provision was not discussed on the argument, nor has it had consideration in connection with any other complaint before us. Standing alone it would seem to impose upon carriers an obligation, general in character and universal in application, to establish through routes and joint rates between all points. But if the provision be read in connection with the language of section 15, above quoted, we are left with the impression that it is simply the declaration of a general principle, the observance of which may be compelled, under section 15 by order of the Commission, not in all cases, but only in particular cases specified in the latter section. It will there be noted that the authority of the Commission to require the establishment of through routes and joint rates is not unlimited. It cannot grant relief when a reasonable or satisfactory through route between the points in question already exists. This limitation has been considered by the Commission in contested cases."

In the amendment to the act to regulate commerce, of June 18, 1910, the limitation referred to was stricken, and the Commission is now clothed with power to establish through routing whenever in its judgment the circumstances warrant the same. The provision in section 1 referred to, as is held by the Commission in the last case, must be read in conjunction with section 15, which latter section reposes discretionary power in the Commission to establish after a hearing through routes and joint classifications. As was said by the Supreme Court in the Abilene, Pitcairn, and Robinson Cases, the sections of the act to regulate commerce, which give a party aggrieved a right of action against the carrier, must be read in conjunction with other provisions of the act, from which the purposes of the whole act may be discovered and the particular sections, under which the actions were brought in those cases, limited in their scope by other provisions of the act in defining its purposes. Would the railroad company, therefore, have the legal right to grant through routing privileges to the defendant steamship companies and refuse the same privileges to the Humboldt Steamship Company and others? That such a right existed at common law is unquestioned. L. R., etc., v. St. L., etc., Co., 63 Fed. 775, 11 C. C. A. 417, 26 L. R. A. 192; s. c. (C. C.) 65 Fed. 39; O. S. L. Co. v. N. P. R. Co. (C. C.) 51 Fed. 465; C. & N. W. Co. v. Osborne, 52 Fed. 912, 3 C. C. A. 347; P. & S. Co. v. A., T. & S. F. Co. (C. C.) 73

Fed. 438; G., C. & S. R. Co. v. S. S. Co., 86 Fed. 407, 30 C. C. A. 142; Central Stock Yards Co. v. L. & N. R. Co., 118 Fed. 113, 55 C. C. A. 63, 63 L. R. A. 213; U. S. v. U. P. Co. (C. C.) 188 Fed. 113; A., T. & S. F. Co. v. D., etc., Co., 110 U. S. 667, 4 Sup. Ct. 185, 28 L. Ed. 291; S. P. Co. v. I. C. C. Co., 200 U. S. 536, 26 Sup. Ct. 330, 50 L. Ed. 585; I. C. C. Co. v. N. P. Co., 216 U. S. 538, 30 Sup. Ct. 417, 54 L. Ed. 608.

"A common carrier engaged in interstate commerce may at common law, and under the interstate commerce law, demand prepayment of freight charges, when delivered to it by one connecting carrier, without exacting such prepayment when delivered by another connecting carrier, and may advance freight charges to one connecting carrier without advancing such charges to another connecting carrier. Such carrier may enter into a contract with one connecting carrier for through transportation, through joint tariff, through billing, and for the division of through rates, without being obligated to enter into a similar contract with another connecting carrier." Gulf, C. & S. F. Ry. Co. et al. v. Miami S. S. Co., 86 Fed. 407, 30 C. C. A. 142.

The case last above cited was an action by the Miami Steamship Company against the Gulf, Colorado & Santa Fé Railway Company and others, to restrain the defendants from entering into a through rating arrangement with the Mallory Steamship line from Galveston to New York, and refusing to make the same arrangements with the plaintiffs. The facts charged in the complaint are very similar to the facts charged in the first five counts of the indictment in this case, but the court held that the through routing privileges were a matter of contract between the connecting carriers, and that the facts charged in the complaint did not constitute a violation of the Sherman Act. It is true the court held that in any event the plaintiff would not be entitled to injunctive relief under the statute, but on page 422 of 86 Fed., on page 157 of 30 C. C. A., the court used the following language:

"We conclude that the several arrangements effected between the Mallory line and the defendant railroad companies are not violative of the common law; that the case attempted to be made in the appellee's bill of complaint in the circuit court cannot be maintained under the Interstate Commerce Act."

4 A.R.—35

And the Supreme Court of the United States in Re Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, held that only such restraints as were denounced by common law are made criminal, by the Sherman Act.

See, also, Interstate Commerce Commission v. Northern Pacific Railway Co., 216 U. S. 538, 30 Sup. Ct. 417, 54 L. Ed. 608, wherein the court said:

"When one through route exists which is reasonable and satisfactory, the fact that the public would prefer a second which is no shorter or better cannot overcome the natural interpretation of a provision in the statute to the effect that jurisdiction exclusively depends upon the fact that no reasonable or satisfactory route exists."

It is true that, since the rendition of that decision, the Interstate Commerce Act was amended by the act of June 18, 1910, and that opinion was rendered in March, 1910, long after, however, the amendment to the Interstate Commerce Act of June 29, 1906, which amendment included the provision in section 1 to the effect that carriers shall establish through routes and just and reasonable rates applicable thereto. It cannot be said, however, in the light of the ruling of the court in the case last cited, that the carrier is compelled to grant through routing privileges to every other connecting carrier, for, as it was held in that case, the Supreme Court refused to force the Northern Pacific Railway Company to grant through routing privileges to the Union Pacific Railway Company from Portland to Seattle, for, as the court said in the case, the facts disclosed a satisfactory through route by way of the Northern Pacific; that is, a route which was reasonably satisfactory to the traveling public, not one that might be satisfactory to a competing carrier. Under the Interstate Commerce Act, as amended in 1910, the Interstate Commerce Commission has the power, and it becomes its duty, to establish through routes and through routing privileges, but only after a hearing. It cannot be assumed that the Interstate Commerce Commission will force a defendant railroad company to grant through routing privileges to every connecting carrier who might petition

for such privilege without imposing any conditions upon such petitioning carrier.

"In the amendment of 1910, this provision as to the reasonableness of an existing route was stricken out, and the Commission was given authority to establish either on a complaint or upon its own initiative through routes and joint classifications and joint rates and the terms and conditions under which these through routes shall be established, whenever the carrier shall have failed or refused to voluntarily establish such through routes and classifications and joint rates." Judson on Interstate Commerce (2d Ed.) § 373.

"The law does not require the Commission in all cases, where no through routes or joint rates exist, to establish them, but only empowers it to do so in proper cases with the intent of giving effect to the general purposes of the act by securing reasonable facilities to the public and preventing unreasonable and unjust rates, practices, and discriminations. In the exercise of this authority, the Commission is bound by the same consideration of justness and fairness as it is in the exercise of the law-giving power in other respects. Where neither the interest of the public nor the ends of justice, as between the parties directly interested, will be promoted by the establishment of through routes and joint rates and the division thereof, the Commission will refuse to exercise the authority conferred upon it with respect to establishing such routes and rates." Barnes, Interstate Transportation, § 181e; Loup Creek Colliery Co. v. Virginia Ry. Co., 12 Interst. Com. Com'n R. 471.

"Where a railroad company is ordered by the Commission to establish with a connecting carrier a through route and joint rate, held that, if for any reason the railroad company conceives that it would incur risk of loss because of the financial ability of the connecting carrier, the Commission would provide, as one of the terms under which the through route was to be operated, that the connecting carrier should give to the railroad company a suitable bond of indemnity." Barnes, Interstate Transportation, § 182.

Under section 15 of the act to regulate commerce, as amended, the Commission is not authorized to establish through routing and force carriers to through route with connecting carriers until after a hearing and a determination that the circumstances warrant such through routing, and, as stated by Barnes, the Commission then has the authority to impose such conditions upon the petitioning and connecting carrier as will in its judgment protect the carrier which objects to granting such through routing privilege. It follows, therefore, that if the question of through routing were submitted to a court or jury, in either a civil or a criminal proceeding, different courts and different jurors might entertain divergent opinions with

respect to the same state of facts, and the jury might find a defendant guilty for refusing to through route under such circumstances and conditions as would cause the Interstate Commerce Commission to refuse to grant such privileges to a petitioning carrier. At common law, as will be conceded, the granting of through routing and billing was a question of contract between connecting carriers and not subject to coercion by the courts. The Interstate Commerce Act, as amended, lodges the power in the Commission to force connecting carriers to grant each other through routing privileges whenever the circumstances will, in the judgment of the Commission, warrant such provision; but the common law is modified in that respect only to the extent of granting such power to the Interstate Commerce Commission, not to the extent of conferring such jurisdiction upon the courts, except for the purpose of enforcing the orders of the Commission.

"Where a railroad company entered into a contract with complainant that, in consideration of complainant's establishment of a cement factory on its line with a capacity of not less than 600 barrels a day, the carrier's regular established tariff rates on cement during a specified period should not exceed those set out in a schedule, complainant, in a suit to restrain the railroad company from establishing and filing higher rates than those obtained in the schedule, could not obtain such relief in the courts in the advance of a finding by the Interstate Commerce Commission on the issue whether the subsequent rates were reasonable or unreasonable, to be determined in the light of the railroad's operation as an entirety." Sandusky Portland Cement Co. v. Baltimore & Ohio Ry. Co., 187 Fed. 583, 111 C. C. A. 439.

The only authority submitted by the government that seems to be in any way conflicting with the views herein expressed is the opinion in the case of United States v. Vacuum Oil Co. (D. C.) 153 Fed. 605, wherein the court held an indictment good which charged discrimination by the defendant against certain localities, although the same matter had not been previously submitted to the Interstate Commerce Commission. The opinion in that case, while rendered subsequent to the opinion in the Abilene Case, was rendered prior to the Pitcairn and Robinson Cases, and the views expressed by the district court in the Vacuum Oil Case seems clearly in conflict with the opinions announced in the Abilene, Pitcairn, and

Robinson Cases; and, while the court holds that the reasoning in the Abilene Case is not applicable to the questions presented in the Vacuum Oil Case, no reasons are given by the district court in the opinion in that case which seem to warrant the conclusion that the holding is not in conflict with the opinion in the Abilene Case. In the light of the ruling, however, in the Pitcairn and Robinson Cases, decided by the Supreme Court of the United States subsequently to the Vacuum Oil Case, it seems reasonably obvious that the conclusions reached by the District Court in the Vacuum Oil Case are not in harmony with the views expressed by the Supreme Court in the three other cases mentioned.

It follows that the court is without jurisdiction to entertain or determine the questions involved in the first five counts of the indictment, in either a criminal or a civil proceeding, until such matters have been submitted to and passed upon by the Interstate Commerce Commission. The demurrers to the first five counts of the indictment must therefore be sustained.

The same reasoning, however, does not apply to the sixth count in the indictment, so far as the defendant corporations are concerned. That count charges the defendants with a violation of section 5440 of the Revised Statutes of the United States, known as the Conspiracy Statute. It is alleged that the defendants conspired to force the Humboldt Steamship Company to enter into an agreement with the defendants for the purpose of maintaining rates and suppressing competition among common carriers between the southern ports named in the indictment and Skagway, Alaska. The indictment clearly states facts showing a violation of section 3 of the Sherman Act. Counsel for the defendants contend that count 6 is bad for the reason that it charges a conspiracy to conspire, which they contend is inconceivable, and cite, to sustain such contention, United States v. Dietrich, 126 Fed. 676; United States v. N. Y., etc., Co. (C. C.) 146 Fed. 298; Thomas v. United States, 156 Fed. 897, 902, 84 C. C. A. 477, 17 L. R. A. (N. S.) 720. But Judge Morrow entertained and held good a similar indictment in Re United States v. Cassidy (D. C.) 67 Fed. 701. The objection is technical, and, in any event, the count

charges sufficient facts to show a violation of section 3 of the Sherman Act, and the language of the indictment charging a violation of section 5440, supra, may be treated as surplusage.

"The substance of the allegations of the count, which are in apt technical language, is that the parties indicted agreed to burn an elevator of one Peter Hoyt, and, in pursuance of that agreement, did burn it. The conspiracy to burn is merged in the consummated act of burning, and so the offense charged is that of arson only, and not the independent offenses of a conspiracy to commit arson and arson." Hoyt v. People, 140 Ill. 588, 30 N. E. 315, 16 L. R. A. 239.

The demurrer, therefore, to the sixth count, so far as the defendant corporations are concerned, should be overruled.

But the demurrers to count 6 of the indictment as to the individual defendants must be sustained, for the specific facts charged in count 6 only apply directly to the defendant corporations. The indictment fails to charge that the individual defendants were either officers or agents of the defendant corporations, or that the acts complained of were performed by and through the individual defendants, acting as officers or agents of the defendant corporations. It is true the corporations must have conspired to suppress competition and to restrain trade and commerce through its officers or agents, but, in the absence of an allegation to the effect that such conspiracy was forced by the corporations through the individual defendants, it must be inferred that such conspiracy was entered into by the corporations through agents and officers other than the individual defendants. It is true that count 6 charges that, pursuant to said conspiracy, the said defendants aided and abetted one another, each co-operating to the same end and for the same purpose and with the intent to effect the object of said conspiracy as aforesaid. But in what manner did the individual defendants aid and abet the other defendants in forwarding or perfecting the conspiracy to restrain trade and commerce as charged in the indictment? If it were alleged that they acted as agents or officers of the defendant corporations in doing the things charged, then the individual defendants would be apprised of what they would be expected to meet on the trial, but, in the absence of any such allegation in the indictment, the mere charge that all of the de-

fendants aided and abetted each other is too indefinite and must be construed as a mere conclusion of law, for, if the acts and things done by the individual defendants, which the pleader conceives to constitute aiding and abetting, were fully set forth, the court might determine that such acts would not constitute an aiding and abetting on the part of the individual defendants. In what way did they aid and abet? By words of encouragement, by actually assisting the corporation defendants in effecting the conspiracy, or did they aid and abet such conspiracy by agreeing to refuse to ship freight on the steamship Humboldt? The law presumes that every man is innocent of the crime charged against him in the indictment, and, assuming that the individual defendants are innocent of any charge of aiding and abetting in the conspiracy described, what is there in the indictment to apprise them of what acts may be proved against them on the trial? There is no allegation charging them with any specific acts. The general charge is made that they aided and abetted the other defendants. The indictment is silent as to the manner in which such aid was rendered.

"An indictment is well enough that states facts which constitute a crime, and in language which leaves no doubt in the minds of the defendants of what they are accused. It is true that a defendant should be informed clearly by the indictment of the exact and full charge made against him, yet the manner in which the information is given is unimportant. An indictment is sufficient when it contains a substantial accusation of crime, and its statements furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against further prosecution for the same offense, and when, from it, the court can determine that the facts charged are sufficient in law to support a conviction." United States v. Swift (D. C.) 188 Fed. 92.

Tested by the above language, the sixth count of the indictment is fatally defective as to the individual defendants, and as to them and each of them the demurrers to the same are sustained.

Let an order be entered in accordance herewith.