UNITED STATES v. NORTH PAC. WHARVES & TRADING CO.
et al.

(First Division. Juneau. April 29, 1912.)

No. 836B.

1. COURTS (§ 433*)—ALASKA—JURISDICTION—NATIONAL AND TERRI-
 ·  TORIAL.

Since March 3, 1909, the district court of Alaska is granted
dual jurisdiction; that is the jurisdiction of an ordinary court
of record to hear, try, and determine all causes, both civil and
criminal, of a local nature, and also the same jurisdiction as a
district court of the United States, as well as the jurisdiction
of a district court of the United States exercising the jurisdic-
tion of a circuit court of the United States.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 433.*]

2. COURTS (§ 433*)—ALASKA—STATUTES—CONSTRUCTION.

, Such construction should be given to the statute in question
as gives effect to the entire section, reconciles it with all other
parts of the Code of Criminal Procedure, and harmonizes with
all other congressional legislation regarding the organization of
the court, its jurisdiction and procedure.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 433.*]

3. COURTS (§ 433*)—ALASKA—GRAND JURY—UNITED STATES AND
TERRITORIAL.

In considering the dual jurisdiction of the district court of
Alaska that it has both United States and territorial jurisdic-
tion, that there is provision for calling only one grand jury, *held*,
if the grand jury is investigating a local crime, it shall follow
the specific provisions of the Code of Criminal Procedure. If it
is investigating national crimes, or infractions of laws not ter-
ritorial, it shall follow the procedure prescribed by the laws of
the United States with respect to grand juries of the United
States District and Circuit Courts.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 433.*]

4. MONOPOLIES (§ 31*)—CONSPIRACY IN RESTRAINT OF TRADE—IN-
DICTMENT.

Defendants are indicted under section 2 of the Sherman Act
(Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p.
3200]) for monopolizing the wharfinger business and facilities at
Skagway, Alaska, by securing a combination of all wharf own-
ers, whereby all wharves there were closed to business, except
one, which was made the terminal of the White Pass Railroad,
engaged in transporting passengers and property coming from

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

the United States, across Alaska into British America. Upon demurrer and the objection that the section did not apply to Alaska, *held* that, since the wharf in question was the terminal of a railroad engaged in interstate and interforeign transportation, and the defendants had thus secured a monopoly of the trade and commerce flowing over it, the act applied and the demurrer was overruled.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

5. MONOPOLIES (§ 31*)—INDICTMENT—CONSPIRACY.

The indictment charges that a conspiracy was entered into by the defendants, whereby they acquired not only all of the existing wharves in Skagway, Alaska, but also all of the existing wharfage facilities, and that, as a part of said conspiracy, it was agreed that three of the four wharves should be closed, except the Pacific Coast wharf, which should be used as a private wharf for the use of the North Pacific Wharves & Trading Company, and its officers; that the railroad company agreed not to extend its railroad to any other wharf, and, as a consideration of such agreement, it was to share with the other defendants certain profits derived from wharfage charges. *Held*, the facts so stated show a concerted effort between the defendants to acquire complete control and monopoly of the wharfage business at Skagway, and a demurrer to the indictment is overruled.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

The indictment in this action charges a violation of sections 2 and 3 of an act entitled "An act to protect trade and commerce against unlawful restraints and monopolies" (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]).

Count 1 charges that the North Pacific Wharves & Trading Company, during the time mentioned, was a corporation organized under the laws of the state of Washington; the Pacific Coast Company was a corporation organized under the laws of the state of New Jersey; the Pacific Coast Steamship Company was a corporation organized under the laws of the state of California; the Pacific & Arctic Railway & Navigation Company was a corporation organized under the laws of the state of West Virginia; that continuously during the ten years next preceding the finding and presentation of the indictment, and continuously and at all times during the three years

next preceding the finding of said indictment at Skagway, in the district of Alaska, all of said defendant corporations, together with the individual defendants, did wrongfully, unlawfully, knowingly, and willfully engage in a combination and conspiracy in restraint of trade and commerce by then and there combining and conspiring with each other to eliminate from and destroy competition in the wharfinger business at Skagway, at Skagway Bay, Alaska, and to monopolize said business; that prior to the monopoly formed in pursuance of said combination and conspiracy, by and between said defendants, there had been constructed and were in existence and operation four separate wharves for docking of ships and the discharging, landing, and loading of freight and passengers from and into ocean-going ships and general water craft at Skagway Bay, at the head of Lynn Canal, Alaska, which wharves ever since their construction in the years 1897 and 1898, and up to the time of the consummation and execution of said conspiracy described in said count, were owned and operated as public wharves by separate and independent owners, one of said wharves being known and designated as Seattle wharf, another being known and designated as Sylvester's wharf, a third being known and designated as Moore's wharf, and a fourth being known and designated as the Pacific Coast wharf, said Skagway Bay being then and there, and ever since 1898 having been, the terminus of a railroad owned and operated by the Pacific & Arctic Railway & Navigation Company, which, connecting with the other transportation lines, formed one continuous line and under one management, and as such known and designated as the White Pass & Yukon Route, referred to in the indictment as the railroad, which line, during all the time therein mentioned, was, and ever since has been, a common carrier of freight and passengers between Skagway, Alaska, and Dawson, Yukon district, Canada, and intermediate points extending approximately 20 miles through American territory from Skagway Bay to the summit of White Pass, thence for a distance of approximately 20 miles through portions of British Columbia to the boundary line between British Columbia and the Yukon district, at and near Lake Bennett,

thence through the said Yukon district of Canada to White
Horse, on the headwaters of the Yukon river, thence by way
of water craft plying on said river to said Dawson, which said
railroad held and exercised during all the times mentioned in
said count, since 1899, a monopoly on the business of transpor-
tation of freight and passengers between Skagway and Daw-
son, and during all the times mentioned in said count an exten-
sive commerce, trade, and traffic was carried on between the
ports of Victoria and Vancouver, in British Columbia, the port
of Seattle, in the state of Washington, as well as other ports of
the United States, and the various cities, communities, and
settlements in the valleys of the Yukon and of the tributaries
of said river, both in British and American territory, and large
quantities of freight and large numbers of passengers were at
all times shipped and transported between the said southern
ports and the said cities, communities, and settlements in the
valleys of the Yukon and its tributaries, which north-going
shipment and transportation naturally would be, when left un-
obstructed and uninterfered with by unlawful combinations or
conspiracies and up to the time of the formation of the combi-
nation and conspiracy described in the indictment, carried, first,
by water craft from said southern ports to Skagway, thence
over one of the said wharves at Skagway, thence by railroad
to the headwaters of the Yukon, thence by water craft plying
on said river to the points of destination, while south-going
freight and passengers naturally would, and would when left
unobstructed and uninterfered with by unlawful combinations
or conspiracies, follow the same route and employ the same
carriers or means of transportation in a southerly direction;
that said wharves occupy all the ground practically available
for wharves at Skagway Bay and were owned and operated
separately and independently of each other, and, until they
were brought under the sole management and control of these
defendants, they were natural and actual competitors for the
wharfinger business at Skagway and the business of handling
freight and passengers going to and from and passing through
the port of Skagway and while said wharves were so separately
owned and operated as public wharves; that the defendants

and one E. J. Shaw, for the purpose and with the intent of monopolizing the wharfinger business at Skagway, and of eliminating all competition therefrom, and to in that manner obstruct and restrain the aforementioned trade and commerce over said wharves, did knowingly, wrongfully, and unlawfully conspire with one another to combine all said wharves at Skagway under one management and ownership and to place all the said wharves under one control, and to that end, and for that purpose, and with that intent, combined and conspired to purchase and acquire for and in the name of the said North Pacific Wharves & Trading Company the title to and the sole ownership and possession of said Moore's wharf, said Sylvester wharf, and said Seattle wharf, and then to close the said last two wharves to business and prevent the use of same by the public, and then to have a contract entered into by and between the said North Pacific Wharves & Trading Company, on the one hand, and the said Pacific Coast Company and the said Pacific Coast Steamship Company, on the other hand, the two latter companies being the owners of and in control of the said Pacific Coast wharf as a public wharf, close the same to general traffic, except for the landing of coal from the ships of the said last two companies carried for said E. J. Shaw and said E. E. Wynn Johnson, but for none others, and otherwise dock all their own ships and such other ships as they should operate, at Moore's wharf, and at no other wharf at Skagway, and in return therefor receive from said E. J. Shaw and C. E. Wynn Johnson 25 cents per ton, as wharfage, for all such coal so discharged on said Pacific Coast wharf, and receive 10 cents per ton for all freight discharged from any of their own vessels or vessels under their managements or by them operated, docking and discharging or taking cargo at the said Moore's wharf, said E. J. Shaw and C. E. Wynn Johnson being then and there officers and agents of said North Pacific Wharves & Trading Company and managers of and in control of the said Moore's wharf, it being further understood and agreed by and between the said defendants, as a part of said conspiracy and combination, that the said railroad company should make and constitute the said Moore's wharf the terminus of its railroad

and refuse to connect with any other wharf at Skagway, and to use the best endeavor and utmost interest to secure for said wharf a monopoly on the said wharfinger business, and in consideration thereof receive its own freight over said wharf free of any wharfage charges, and, in addition thereto, receive a part of the proceeds from the wharfage collected at said wharf; that pursuant to said combination and conspiracy, and in consummation thereof, and for the purpose and with the intent aforesaid, the defendants and said E. J. Shaw did purchase, acquire, and secure sole and exclusive possession, management, and control of the said Moore's wharf, the said Sylvester wharf, and the said Seattle wharf, and, subsequent to and at all times after the acquisition of title, possession, and control of the said three wharves by the defendants, the said Sylvester wharf and the said Seattle wharf were, for the purpose and with the intent aforesaid, by the said defendants, and at their instigation, closed to all traffic, trade, and commerce, and have been so closed by said defendants continuously during the last three years immediately preceding the finding and presentation of the indictment, and pursuant to said conspiracy, and in consummation thereof, a contract was entered into by and between the Pacific Coast Steamship Company, on the one hand, and the North Pacific Wharves & Trading Company, on the other hand, wherein and whereby the Pacific Coast Company and the Pacific Coast Steamship Company agreed to discontinue the wharfinger business at Skagway Bay and to close the said Pacific Coast wharf to public business, save and except to discharge coal on said wharf for the said Shaw and the said Johnson, and for no one else, and to dock all their vessels and such other vessels as they may operate or control at the said Moore's wharf, in consideration of which the said North Pacific Wharves & Trading Company, through its officers and agents, agreed to pay to the said Pacific Coast Steamship Company 10 cents per ton for each ton of freight discharged on or loaded from said Moore's wharf by any of the ships or vessels owned, operated, or controlled by the said Pacific Coast Company or the said Pacific Coast Steamship Company, which contracts

have been adhered to and carried out continuously by said defendants and said Shaw during the last three years immediately preceding the finding and presentation of the indictment, and by reason of which facts and said conspiracy the Moore's wharf became and was, during all the time during the last three years immediately preceding the finding and presentation of the indictment, the only public wharf at Skagway Bay and the only wharf over which said trade and commerce could be carried, and by reason of said combination and conspiracy the said defendants and said Shaw secured to the North Pacific Wharves & Trading Company, its officers, agents, and owners, during all the time aforesaid, a complete monopoly of the said wharfinger business at Skagway Bay, Alaska.

The indictment further charges that the individual defendants represented the different corporations in the consummation of such conspiracy.

Count 2 charges an actual monopolization of the wharfinger business at Skagway, and sets forth substantially the same facts as count 1.

To the indictment, the defendants interposed a motion to quash, which was argued, submitted, and decided as a demurrer.

John Rustgard, Dist. Atty., of Juneau, for the United States.

Ira Bronson, of Seattle, Wash., Royal A. Gunnison, of Juneau, Bogle, Graves, Merritt & Bogle, of Seattle, Wash., Shackleford & Bayless, of Juneau, and Farrell, Kane & Stratton, of Seattle, Wash., for defendants.

LYONS, District Judge. It was agreed between counsel for the defendants and for the government in this case, as well as in cause No. 837B (United States of America v. Pacific & Arctic Railway & Navigation Co., a Corporation, et al., 4 Alaska, 530), that the questions tendered by the motion might be argued and considered by the court in the same manner as if raised by demurrer. The court will therefore consider the case as if a demurrer had been interposed, for, in the

opinion of the court, the questions presented should be raised by demurrer and not by motion to quash.

The first serious question raised is whether or not the indictment is vulnerable to the attack made upon it by the demurrer on account of charging more than one crime. The defendants demurred to the indictment in this and all of the other causes wherein more than one crime is set out in the indictment, and among the grounds assigned in said demurrer is that the indictment charges more than one crime. The defendants rely on section 43 of the Code of Criminal Procedure for the district of Alaska, which provides:

"That the indictment must charge but one crime, and in one form only, except that, where the crime may be committed by use of different means, the indictment may allege the means in the alternative."

The government contends that the section of the Code last cited is not applicable to the prosecution of crimes of the character charged in the indictment, but that, the crimes being national in character, the procedure with reference to the number of offenses or crimes which may be charged in an indictment is found in section 1024 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 720), which provides as follows:

"When there are several charges against any person for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offenses, which may be properly joined, instead of having several indictments, the whole may be joined in one indictment in separate counts; and, if two or more indictments are found in such cases, the court may order them to be consolidated."

The question presented is interesting, and the determination of the same is not free from difficulty. To uphold this contention, the defendants rely on the peculiar wording of certain sections of the Code of Criminal Procedure for the district of Alaska, and also upon the following adjudicated cases: Hornbuckle v. Toombs, 85 U. S. (18 Wall.) 648, 21 L. Ed. 966; Clinton v. Englebrecht, 80 U. S. (13 Wall.) 434, 20 L. Ed. 659; Good v. Martin, 95 U. S. 90, 24 L. Ed. 341; Reynolds v. United States, 98 U. S. 149, 25 L. Ed. 244; Miles v. United States,

103 U. S. 304, 26 L. Ed. 481; Cochran v. United States, 147
Fed. 206, 77 C. C. A. 432; Jackson v. United States, 102 Fed.
473, 42 C. C. A. 452; Thiede v. Utah, 159 U. S. 510, 16 Sup.
Ct. 62, 40 L. Ed. 237; United States v. Haskell (D. C.) 169
Fed. 449; Fitzpatrick v. United States, 178 U. S. 304, 20 Sup.
Ct. 944, 44 L. Ed. 1078; Welty v. United States, 14 Okl. 7,
76 Pac. 122.

It will be observed, after a careful consideration of the
case cited, that Clinton v. Englebrecht and Hornbuckle v.
Toombs, supra, are the leading cases cited by the defendants
announcing the doctrine that the various territories created by
Congress under the Constitution, and to whom Congress has
delegated the power to legislate for themselves, have been em-
powered under the organic acts creating them to legislate on
all matters of local concern not inconsistent with the Constitu-
tion of the United States and the organic acts creating such
territories.   It will also be observed that all the organic acts
creating the territories and empowering them to elect local
Legislatures to legislate for said territories contain substantial-
ly the same provision as that conferring legislative authority
on the territory of Utah, which is quoted in Clinton v. Engle-
brecht, 80 U. S. (13 Wall.) on page 444, 20 L. Ed. 659, as fol-
lows:

"The legislative power of said territory shall extend to all rightful
subjects of legislation, consistent with the Constitution of the United
States and the provisions of this act."

It is apparent from such legislation that Congress intended
that the Legislatures of the various territories should be vested
with full power to legislate, not only concerning legal pro-
cedure, both criminal and civil, but also to enact any sub-
stantive legislation not inconsistent with the Constitution of
the United States and the acts of Congress creating such ter-
ritories.   The Supreme Court of the United States, in the
cases of Clinton v. Englebrecht and Hornbuckle v. Toombs,
supra, holds that the power granted to the Legislatures to leg-
islate for the territories, and the approval of their legislation
by Congress, indicates that it was the intention of Congress
to lodge in the local Legislatures of the territories power to

legislate when not in conflict with the Constitution of the United States or the organic acts of such territories. It must therefore be conceded to be the settled law that, in a territory where a Legislature has been provided for by act of Congress, such Legislature has the power to provide for the procedure to govern the trial of all causes without reference to whether or not the same are being conducted under the local laws of the territory or under the general laws of the United States. The Alaska cases cited by counsel, which have been passed on by our Appellate Court, deal with question of procedure in the prosecution of violations of the local laws. It must be admitted that Alaska is an organized territory, within the meaning of section 1891 of the Revised Statutes of the United States, which provides:

"The Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within all the organized territories, and in every territory hereafter organized, as elsewhere within the United States." Nagle v. United States, 191 Fed. 141, 111 C. C. A. 621.

But does it follow because Congress has seen fit to grant to the Legislatures of the territories, where legislative assemblies are provided to enact a complete set of laws governing procedure in all cases, that it did not intend to extend to Alaska any of the general laws of the United States providing for the procedure in federal courts? This question must be answered after a careful consideration of the various acts of Congress relating to the organization of the district court for the district of Alaska and laws of procedure for said district. On May 17, 1884, Congress passed an act entitled "An act providing a civil government for Alaska" (23 Stat. 24, c. 53). Section 3 of that act provides, among other things:

"That there shall be, and hereby is, established a district court for said district, with the civil and criminal jurisdiction of District Courts of the United States, and the civil and criminal jurisdiction of District Courts of the United States exercising the jurisdiction of Circuit Courts, and such other jurisdiction, not inconsistent with this act, as may be established by law."

On June 6, 1900, Congress passed another act entitled "An act making further provisions for a civil government for

4 A.R.—36

Alaska, and for other purposes" (Act June 6, 1900, c. 786, 31 Stat. 321). The last-mentioned act includes a Political Code, a Code of Civil Procedure, and a Civil Code for the district of Alaska. Section 4 of said Political Code, found on page 132 of Carter's Annotated Alaska Codes, provides, among other things:

"There is hereby established a district court for the district, which shall be a court of general jurisdiction in civil, criminal, equity, and admiralty causes; and three district judges shall be appointed for the district, who shall, during their terms of office, reside in the divisions of the district to which they may be respectively assigned by the President."

On March 3, 1909, Congress passed an additional act entitled "An act to amend section 86 of an act to provide a government for the territory of Hawaii, to provide for additional judges, and for other judicial purposes" (Act March 3, 1909, c. 269, 35 Stat. 838). Section 4 of the last-mentioned act provides, among other things:

"That there is hereby established a district court for the district of Alaska, with the jurisdiction of Circuit and District Courts of the United States and with general jurisdiction in civil, criminal, equity, and admiralty causes."

By the act of May 17, 1884, supra, the district court of Alaska is granted dual jurisdiction; that is, the jurisdiction of an ordinary court of record to hear, try, and determine all causes, both civil and criminal, of a local nature, and also the same jurisdiction as a district court of the United States, as well as the jurisdiction of a district court of the United States exercising the jurisdiction of a circuit court of the United States. The act of June 6, 1900, supra, limited the jurisdiction of the district court for the district of Alaska to the trial of local causes. United States v. Newth (D. C.) 149 Fed. 302. But the act of March 3, 1909, supra, again conferred such dual jurisdiction upon the district court for the district of Alaska which was granted to it by the original organic act of May 17, 1884, supra. It is obvious, therefore, that from May 17, 1884, until June 6, 1900, the district court for the district of Alaska was empowered to exercise dual jurisdiction. From June 6, 1900, until March 3, 1909, the jurisdiction of the district court

for the district of Alaska was confined to matters of local concern. But by the passage of the act of Congress of March 3, 1909, the district court for the district of Alaska was again clothed with dual jurisdiction. It is manifest, therefore, that the district court for the district of Alaska has now jurisdiction of the violations of all local laws of the district of Alaska as well as the violations of all national laws applicable to the district of Alaska when the same are committed within the territorial limits of the district or on the high seas.

Section 7 of the act of May 17, 1884, supra, provides:

"That the general laws of the state of Oregon now in force are hereby declared to be the law in said district, so far as the same may be applicable and not in conflict with the provisions of this act or the laws of the United States."

On March 3, 1899, Congress passed an act entitled "An act to define and punish crimes in the district of Alaska and to provide a code of criminal procedure for said district." Act March 3, 1899, c. 429, 30 Stat. 1253. The last-mentioned act contains a penal code and a code of criminal procedure. Sections 1, 10, and 13 of the Code of Criminal Procedure, found on pages 45, 46, and 47 of Carter's Annotated Alaska Codes, provide:

"Section 1. That proceedings for the punishment and prevention of the crimes defined in title 1 of this act shall be conducted in the manner herein provided."

"Sec. 10. That grand juries, to inquire of the crimes designated in title one of this act, committed or triable within said district, shall be selected and summoned, and their proceedings shall be conducted, in the manner prescribed by the laws of the United States with respect to grand juries of the United States District and Circuit Courts, the true intent and meaning of this section being that but one grand jury shall be summoned in each division of the court to inquire into all offenses committed or triable within said district, as well those that are designated in title one of this act, as those that are defined in other laws of the United States."

"Sec. 13. That the grand jury have power, and it is their duty, to inquire into all crimes committed or triable within the jurisdiction of the court, and present them to the court, either by presentment or indictment, as provided in this act."

The determination, therefore, of the question now under consideration may be solved by a correct interpretation of the

three sections of the Code of Criminal Procedure for the district of Alaska, last quoted.   The defendants contend that section 13 must control, and that by section 13 it is provided that all presentments or indictments must be in accordance with such Code of Criminal Procedure, and therefore must be drawn in accordance with section 43, heretofore quoted, which provides that each indictment must charge but one crime and in one form only.   The government contends that section 1 and section 10 must be construed with section 13 in such manner as to give effect to each and all of said sections.   By section 1 it is provided that all crimes defined in title 1 of the Penal Code for the district of Alaska must be prosecuted in the manner provided in the Code of Criminal Procedure. Applying the maxim, "Expressio unius est exclusio alterius," to such section (that is, that express mention of anything in a statute implies the exclusion of all other things) forces the conclusion that the prosecution of all other laws not defined in title 1 must be prosecuted in accordance with some other procedure.   It is impossible to harmonize the letter of the language used in section 10 with section 1 or with any other part of the Code of Criminal Procedure for the district of Alaska, for section 10 provides, among other things:

"That grand juries, to inquire of the crimes designated in title one of this act, committed or triable within said district, shall be selected and summoned, and their proceedings shall be conducted, in the manner prescribed by the laws of the United States with respect to grand juries of the United States District and Circuit Courts."

It is true that grand juries to inquire of the crimes defined in title 1, supra, are selected and summoned in the manner prescribed by the laws of the United States with respect to grand juries of the United States District and Circuit Courts, but their proceedings are not conducted in the manner prescribed by such laws, for the manner of their proceeding is completely defined and prescribed by the Code of Criminal Procedure itself.   What, therefore, is the meaning of, and what construction can be given to, section 10, supra, which will cause it to harmonize with sections 1 and 13 and give effect to all such sections?   It is apparent that the framers of

section 10 had in mind dual procedure for the district court for the district of Alaska in the prosecution of crimes, because the Code of Criminal Procedure prescribes a procedure which governs grand juries while they are investigating local or territorial crimes; but section 10 provides that the grand juries shall be governed by the rules of proceedings prescribed by the laws of the United States with respect to grand juries of United States District and Circuit Courts. It is evident, therefore, that it is necessary, in order to arrive at a correct construction of section 10, that the court disregard its letter and give force and effect to its spirit. While its language is confusing and contradicts section 1, as well as other provisions of the Code of Criminal Procedure, when carefully considered in the light of the dual powers of the court as well as the other sections of the Code of Criminal Procedure, it is reasonably clear that Congress intended by section 10 to provide for two methods of procedure, one to govern the trial of offenses against the general laws of the United States, and the other to govern the proceedings in the prosecution of local or territorial crimes in the district of Alaska and to provide a code of criminal procedure in said district. Section 10, therefore, should receive the construction which would be warranted if it contained the following language:

"That the grand juries, to inquire of the crimes designated in title one of this act, committed or triable within said district, shall be selected and summoned in the manner prescribed by the laws of the United States with respect to grand juries of the United States District and Circuit Courts; and grand juries, to inquire of crimes defined in other laws of the United States, committed or triable within said district, shall be selected and summoned and their proceedings shall be conducted in the manner prescribed by the laws of the United States with respect to grand juries of the United States District and Circuit Courts; the true intent and meaning of this section being that but one grand jury shall be summoned in each division of the court to inquire into all offenses committed or triable within said district, as well those that are designated in title one of this act as those that are defined in other laws of the United States."

Such construction gives effect to the entire section, reconciles it with all other parts of the Code of Criminal Procedure, and harmonizes with all other congressional legislation regard-

ing the organization of the district court for the district of Alaska, its jurisdiction and procedure.

"Closely allied to the doctrine of the equitable construction of statutes, and in pursuance of the general object of enforcing the intention of the Legislature, is the rule that the spirit or reason of the law will prevail over its letter. Especially is this rule applicable where the literal meaning is absurd, or, if given effect. would work injustice, or where the provision was inserted through inadvertence. Words may accordingly be rejected and others substituted, even though the effect is to make portions of the statute entirely inoperative. So the meaning of general terms may be restrained by the spirit or reason of the statute, and general language may be construed to admit implied exceptions." 30 Cyc. 1108, 1109, and cases cited; Holy Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226; Interstate Drainage & Investment Co. v. Board of Commissioners, 158 Fed. 270, 85 C. C. A. 532.

In the opinion of the last-mentioned case, on page 273 of 158 Fed., on page 535 of 85 C. C. A., the court used the following language:

"The essential object of judicial construction of a statute is to discover the legislative mind in enacting it. The first step in the analysis is to perceive, from the face of the whole act, what was the underlying purpose. The intention of a legislative act may often be gathered from a view of the whole and every part of a statute taken and compared together. When the true intention is accurately ascertained, it will always prevail over the literal sense of the terms. The occasion and necessity of the law, the mischief felt, and the object and remedy in view are to be considered. When the expression in a statute is special or particular, but the reason general, the special shall be deemed general, and the reason and intention of the lawgiver will control the strict letter of the law when the latter would lead to palpable injustice, contradiction, and absurdity.'"

See, also, Wisconsin Industrial School for Girls v. Clark County, 103 Wis. 651, 79 N. W. 422; State v. Railroad Commission, 137 Wis. 80, 117 N. W. 846, wherein the court, among other things, said:

"The actual judicially determined legislative intent must always govern, if expressed at all, so as to be discernible by the searchlights which the court possesses. They permit of looking at a written law as a whole, to the subject with which it deals, to the reason and spirit thereof, to give words a broad or narrow construction, going either way to the limits of their reasonable scope, to supply omitted words which are clearly in place by implication, to change one word for another in case of the wrong one being clearly used, and so read out of the enactment the real intent, even though it may be contrary

to the letter thereof. * * * One of the most familiar and safe canons of construction may be stated thus: For the purpose of clearing up obscurities in a law, it should be read with reference to the leading idea thereof; such idea being regarded as such limitation upon particular words or clauses and expansion of others within the scope thereof, in connection with that of words clearly implied, and be thus, if reasonably practicable, brought into harmony with such idea."

Unless section 10 is construed so as to limit the following language:

That "their proceedings shall be conducted, in the manner prescribed by the laws of the United States, with respect to grand juries of the United States District and Circuit Courts"—

in its application to the rules of procedure that govern the grand jury while investigating violations of the general laws of the United States, it is meaningless and contradicts section 1, as well as all other provisions of the Code of Criminal Procedure, for it is not true that grand juries, when investigating crimes defined in title 1, supra, follow the procedure governing grand juries of United States courts, but do follow the procedure prescribed by the Code of Criminal Procedure.

We must next consider the true intent and meaning of section 13, bearing in mind that section 10 provides that grand juries inquiring of crimes not defined in title 1, supra, shall be governed by the procedure followed by grand juries of the United States District and Circuit Courts. We find that section 13 does not in any manner contradict section 10 when so construed, for it provides:

"That the grand jury have power, and it is their duty, to inquire into all crimes committed or triable within the jurisdiction of the court, and present them to the court, either by presentment or indictment, as provided in this act."

That is, if the grand jury is investigating a local crime, it shall follow the specific provisions of the Code of Criminal Procedure; if it is investigating national crimes, or infractions of laws not defined in title 1, it shall follow the procedure prescribed by the laws of the United States with respect to grand juries of the United States District and Circuit Courts. Thus both procedures are provided for by this act; that is, the

act to define and punish crimes in the district of Alaska and to provide a Code of Criminal Procedure in said district, by giving section 10 the construction heretofore indicated. The proceedings prescribed by the laws of the United States with respect to grand juries for the United States District and Circuit Courts are a part of the Code of Criminal Procedure, and are made to apply to and govern the grand jury when investigating violations of laws other than those defined in title 1, supra (that is, section 10 incorporated in and makes such procedure a part of the act referred to in section 13), and when the grand jury, while inquiring into violations or infractions of the general laws of the United States, follows the federal procedure, it is proceeding according to the requirements of section 13. Nor does such a construction of the three sections in any way bring section 1 in conflict with the other two sections, for section 1 provides for the entire proceeding in the punishment of crimes defined in title 1, not only in the proceedings that govern the grand jury, but also the proceedings that govern the trial of such criminal cases, while sections 10 and 13 merely deal with the proceedings of the grand jury.

"Statutes in pari materia are those which relate to the same person or thing, or to the same class of persons or things. In the construction of a particular statute, or in the interpretation of any of its provisions, all acts relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law. The endeavor should be made by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the Legislature, or to discover how the policy of the Legislature with reference to the subject-matter has been changed or modified from time to time. With this purpose in view, therefore, it is proper to consider, not only acts passed at the same session of the Legislature, but also acts passed at prior and subsequent sessions, and even those that have been repealed. So far as reasonably possible, the several statutes, although seemingly in conflict with each other, should be harmonized, and force and effect given to each, as it will not be presumed that the Legislature, in the enactment of a subsequent statute, intended to repeal an earlier one, unless it has done so in express terms; nor will it be presumed that the Legislature intended to leave on the statute books two contradictory enactments. Whenever a Legislature has used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject-matter, it will be understood as using it in the same sense, unless there be something in the context or the nature of things to indicate that it intended a different meaning

thereby.  It must not be overlooked, however, that the rule requiring statutes in pari materia to be construed together is only a rule of construction to be applied as an aid in determining the meaning of a doubtful statute, and that it cannot be invoked where the language of a statute is clear and unambiguous."   30 Cyc. 1147, 1149, 1150, and cases cited.

In the light of the fact that Congress has seen fit to confer on the district court for the district of Alaska the jurisdiction of a United States District Court and the consequent power to try all cases involving the violation or infraction of the national laws committed within the said district, and in the further light of section 1891 of the Revised Statutes, which extends to all territories the Constitution and all laws of the United States that are not locally inapplicable, which section has been held to apply to Alaska (Nagle v. United States, 191 Fed. 141, 111 C. C. A. 621), the court should not assume that the provisions of the general statutes of the United States, governing the procedure in the federal courts, were not extended to the district of Alaska unless the legislation of Congress makes manifest its intent to extend only the substantive laws of the United States to the district and to withhold the general laws of procedure.   It follows, therefore, that section 1024 of the Revised Statutes, supra, applies to Alaska and may be followed by the grand jury when considering infractions of laws of the United States not defined in title 1 of the act to define and punish crimes within the district of Alaska and to provide a code of criminal procedure for said district.

Since Congress has reserved to itself the exclusive power to legislate for Alaska, has extended to this territory all the general laws of the United States not locally inapplicable, and has conferred on this court the jurisdiction of a United States District Court to punish all violations of such laws, what could be its purpose in refusing to extend to this district the laws and rules of procedure of the United States District Courts, which the light of experience has proved to be so adequate and satisfactory in the prosecution of offenses of the character charged in the indictment?   Section 1 of the Code of Criminal Procedure, supra, clearly implies the existence of other rules of procedure applicable to inquiries concerning crimes not de-

fined in title 1 of that act, and the intention of Congress to provide such other rules of procedure to govern the proceedings of the grand jury, when inquiring into violations of the general laws of the United States, is manifested in section 10 of the same Code.

The defendants further contend that section 2 of what is commonly known as the Sherman Act does not apply to Alaska, for it provides that:

"Every person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

The defendants claim that that section cannot apply to Alaska. But the indictment charges that some of the freight which passes over Moore's wharf is carried from the state of Washington, through British Columbia, Alaska, and the Yukon territory; and for that reason the wharf is used as a connecting link in the train of transportation between the water craft and the railroad; that the interstate and interforeign freight is carried over the wharf from the steamships into the railroad cars; that the wharf is therefore used as one of the terminal facilities and instrumentalities of the railroad, and is necessarily used in the conveyance of freight and passengers from the state of Washington to Canada or the Yukon territory. Section 1 of the act to regulate commerce, as amended (Act June 18, 1910, c. 309, § 7, 36 Stat. 545 [U. S. Comp. St. Supp. 1911, p. 1285]), provides, among other things:

"The term 'common carrier' as used in this act shall include express companies and sleeping-car companies. The term 'railroad' as used in this act shall include all bridges and ferries used or operated in connection with any railroad, and also all the roads in use by any corporation operating a railroad, whether owned or operated under a contract, agreement, or lease, and shall also include all switches, spurs, tracks, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, and also all freight depots, yards, and grounds used or necessary in the transportation or delivery of any of said property."

In re Southern Pacific Terminal Co. v. I. C. C., 219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. 310, the court held that a wharf in that case was one of the terminal facilities of the railroad and was an instrumentality of a common carrier, within the meaning of the Interstate Commerce Act. It is true that in that case the Southern Pacific Railway owned 99 per cent. of the stock of the wharf company, and therefore directed the management of the wharf company, but the facts in this case, while differing in some respects, warrant the application of the reasoning in the case last cited to the effect that the wharf, being a terminal facility of the railroad company, is subject to the act to regulate commerce and its amendments. In the case at bar the indictment charges that, by agreement between the wharf company and the railroad company, the wharf was used as the railroad terminal and was subjected to the use of transferring interforeign freight from the steamship carriers to the railroad. No particular appliance of a railroad constitutes and is a common carrier, but all of the appliances and instrumentalities used by the railroad company for the purpose of transporting freight and passengers in interstate and interforeign commerce constitute the common carrier, and all such instrumentalities are subject to the act to regulate commerce, when used in transporting freight or passengers in interstate or interforeign commerce. It is true that indictment charges that the Moore's wharf is owned by the North Pacific Wharves & Trading Company, but by agreement with that company it is used as a terminus by the railroad company, and all interforeign freight is conveyed from the water carriers across the wharf into the railroad cars. It is also true the act to regulate commerce does not mention wharves, but it does mention terminal facilities, and the indictment charges that the wharf is a terminal facility of the railroad, and is used as a necessary adjunct thereto in the transportation of freight and passengers from the said state of Washington and British Columbia to the Yukon territory in the Dominion of Canada. For that reason it is an instrumentality used by the railroad company and the steamship

companies in the transportation of passengers and freight from one state of the United States to a foreign country.

The defendants further insist that the indictment fails to charge facts which constitute a crime under either the second or third section of the Sherman Act, and insist that the general charge of a combination and conspiracy to restrain trade wrongfully and unlawfully is not sufficient to charge a crime under that act, unless the specific facts constituting such alleged conspiracy are fully stated in the indictment. The indictment charges that a conspiracy was entered into by the defendants, whereby they acquired, not only all of the existing wharves in Skagway, Alaska, but also all of the existing wharfage facilities; that as a part of said conspiracy it was agreed that three of the four wharves should be closed, except the Pacific Coast wharf, which should be used as a private wharf for the use of the North Pacific Wharves & Trading Company and its officers. The indictment further charges that the railroad company agreed not to extend its railroad to any other wharf, and, as a consideration of such agreement, it was to share with the other defendants certain profits derived from wharfage charges. The specific facts stated in count 1 of the indictment therefore show a concerted effort between the defendants to acquire complete control and monopoly over the wharfage business at Skagway; and count 2 charges facts sufficient to show a complete monopolization of such business at that place pursuant to such alleged conspiracy.

"The test of the legality of a contract or combination under the Sherman Anti-Trust Act is its direct and necessary effect upon competition in interstate or international commerce. The act embraces and declares to be illegal every contract combination or conspiracy in whatever form, of whatever nature, and whoever may be parties to it, which directly or necessarily operates in restraint of trade or commerce among the several states or with foreign nations. If the necessary effect of a contract, combination, or conspiracy is to stifle, or directly and substantially to restrict, free competition in interstate or international commerce, it is within the terms of that enactment and violates the law. The natural effect of competition is to increase commerce, and an agreement whose direct effect is to prevent this play of competition restrains instead of promotes trade and commerce. So it is declared in a case in the Circuit Court that the real

question in every case which arises under the Anti-Trust Act is whether or not the contract, combination, or conspiracy challenged is in restraint of trade among the states. 'It has now been settled by repeated decisions of the Supreme Court that this question must be tried, not by the intent with which the combination was made, nor by its effect upon traders, producers, or consumers, but by the necessary effect which it has in defeating the purpose of the law. That purpose was to prevent the stifling or substantial restriction of competition, and the test of the legality which was inspired by this purpose is its direct and necessary effect upon competition in commerce among the states. If its necessary effect is to stifle or to directly and substantially restrict free competition, it is a contract, combination, or conspiracy in restraint of trade, and it falls under the ban of the law.' Again, in order to vitiate a combination, such as the act of Congress condemns, it need not be shown that the combination in fact results or will result in a total suppression of trade or is a complete monopoly, but it is only essential to show that by its necessary operation it tends to restrain interstate or international trade or commerce or tends to create a monopoly in such trade or commerce and to deprive the public of the advantages that flow from free competition. So in order to maintain a bill for an injunction, under the Sherman Anti-Trust Act, the government is not obliged to show that the agreement in question was entered into for the purpose of restraining trade or commerce if such restraint is its necessary effect." Joyce on Monopolies, § 80; Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663.

The defendants contend that the indictment is fatally defective because it fails to charge that the defendants intended by their combination to restrain and monopolize trade and commerce, but the indictment does charge that they wrongfully, unlawfully, knowingly, and willfully engaged in such a combination and conspiracy for the purpose of restraining trade and commerce. It may be questioned whether or not it is necessary to charge an intention to commit the offense denounced by the Sherman Act, but even if such were required in the indictment, when the acts are charged to have been knowingly and willfully done, it must be inferred that they were done intentionally.

It was also contended by counsel for the defendants on the argument that the counts in the indictment were duplicitous, but it is evident that the facts stated in each count merely disclose all of the circumstances under which the alleged con-

spiracy to control the wharfinger business at Skagway, Alaska, was entered into and the methods to be adopted to monopolize such business.

It therefore results that both counts of the indictment are sufficient, and that the demurrer should be overruled. Let an order be entered in accordance herewith.